**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 19-62972-CIV-ALTMAN**

**ROBERT KLECKLEY**,

*Petitioner*,

*v.*

**STATE OF FLORIDA**,

*Respondent*.
_________________________________/

# ORDER

The Petitioner, Robert Kleckley, filed a Petition under 28 U.S.C. § 2254, challenging the constitutionality of his state-court convictions and sentences. *See generally* Petition [ECF No. 1]. In a prior order, we denied Grounds One through Three and Ground Eleven on the merits, but we dismissed Grounds Four through Ten as untimely. *See* Order Denying Petition [ECF No. 28]. Now, the Eleventh Circuit has reversed our timeliness ruling and remanded the case for us to consider Kleckley's seven remaining grounds. *See* Eleventh Circuit Opinion [ECF No. 48]. With the case remanded, the Respondent filed a renewed Response [ECF No. 51] as well as an Appendix [ECF No. 52]; the trial and resentencing transcripts were refiled [ECF No. 53]; and Kleckley filed a Reply [ECF No. 54-1]. The remaining claims are thus ripe for resolution. After careful consideration, we **DENY** Grounds Four through Ten on the merits.

## BACKGROUND

**The Shooting.** In the early morning hours of August 20, 1999, Miguel Rodriguez and his friend, Jammie Cobb, planned to attend a concert at the Brick House, a nightclub on South State Road 7 in Plantation, Florida. *See* Trial Transcript ("Trial Tr.") [ECF No. 53-1] at 244–46, 309–10.[1]

[1] We draw our transcript citations from the blue CM/ECF header pagination.

They parked Rodriguez's Ford Expedition in a lot across the street. *See id.* at 246. When Rodriguez called out a friendly goodbye to two women, a man—whom Rodriguez and Cobb later identified as Kleckley—walked over and complained: "[Y]ou don't have to be saying[,] 'goodnight[,] drive home safe' to my woman." *Id.* at 249:3–4 (cleaned up). Rodriguez answered that he "wasn't talking to your woman." *Id.* at 249:22. Although Kleckley drove away, he warned Rodriguez that "this is not going to end like this." *Id.* at 252:5–6.

About twenty minutes later, Rodriguez saw Kleckley "sneaking up" behind his Ford Expedition with two other men. *Id.* at 292:1. Hoping to defuse the confrontation, Cobb observed that "it would be stupid for you to shoot this guy when the cops are across the street," *id.* at 315:3–5, but Kleckley insisted that he had "something against this sucker right here," speaking of Rodriguez, *id.* at 315:23–24. Still, Kleckley started to walk away when one of his companions said: "[W]e ain't come all this way back here for nothing." *Id.* at 316:7–8.

Rodriguez testified that Kleckley then "pulled [a] gun out of his waist" and shot him in the forearm and leg. *Id.* at 254:22; *see also id.* at 254–55. Bleeding from the gunshot wounds, Rodriguez "turned on [his] truck and drove away" as Kleckley began "continuously" shooting. *Id.* at 255:15–17. Rodriguez later explained that he looked at the shooter "straight in the face" and remembered "braided" hair and "lots of gold teeth." *Id.* at 305:15–20. Cobb testified that, after Kleckley's friend spoke up, he "saw Kleckley reach" for a gun and ran for safety as he "heard shots give out[.]" *Id.* at 316:9–14. That's when Cobb noticed that Rodriguez had been shot. *See id.* at 316.

Driving nearby, Officer Humberto Pacini "heard shots fired," *id.* at 398:22, and saw two people pointing at a green Oldsmobile Cutlass Supreme, *see id.* at 400. When Pacini asked, "who did the shooting," the witnesses again pointed at the Oldsmobile, so he activated his sirens and pursued it. *Id.* at 401:19–402:8. Now being chased by police, the Oldsmobile crashed, and Pacini saw a "[b]lack male" with "short dreads" climb out of the passenger side and run westbound. *Id.* at 406:18–19,

408:24. Back at the scene of the crashed Oldsmobile, officers detained the two men who stayed behind. *See id.* at 408.

Detective Robert McLain testified that law enforcement then "secured a Search Warrant" for the Oldsmobile and searched it later that same day. *Id.* at 426:9–15. During the search, detectives found "two photographs taken at the Brick House Club" beneath the driver's seat, *id.* at 426:24–427:1, one of which Detective Michael Jasinski testified featured Kleckley with a woman named Karen Noltion, *see id.* at 456:20–22. Detective Michael Scott testified that the search also revealed "a letter from the Florida Power and Light [("FP&L")] to a [Robert] Kleckley," along with "some type of prescription for" Noltion. *Id.* at 439:14–18. At 6:00 p.m. on the day of the shooting, detectives placed Kleckley's photograph in a six-person "photo lineup" and showed them to Rodriguez, who identified Kleckley as the shooter. *Id.* at 452–55.

That identification led officers to Kleckley's address, where they arrested him around 8:00 p.m. *See id.* at 464–65. Kleckley's booking photograph showed what an evidence technician described—before a sustained objection—as "a large bump on his forehead." *Id.* at 378:18–19. Three days later, on August 23, 1999, Detective Jasinski showed a separate six-person photo lineup to Cobb, who likewise identified Kleckley as the shooter. *See id.* at 467–68.

On September 8, 1999, the State of Florida charged Kleckley with attempted first-degree murder ("Count One"), shooting at or into an occupied vehicle ("Count Two"), and possession of a firearm by a convicted felon.[2] *See* Information [ECF No. 52-1] at 10–11.

**The Trial.** Both Rodriguez and Cobb identified Kleckley again at trial. *See id.* at 249:8–16 (noting Rodriguez's in-court identification of Kleckley as "[the] person that shot [him]"); *id.* at 316:21–24 (noting Cobb's in-court identification of Kleckley as the man who confronted Rodriguez). In

[2] The State later abandoned the felon-in-possession count. *See* Judgment and Sentence [ECF No. 52-1] at 19–26.

addition to Rodriguez and Cobb, the jury heard from Susan Plunske and Steven Weathers—both Plantation Police identification technicians—and Margaret Michael-Kitz, a Plantation Police crime-scene technician, *see id.* at 345, 359, 385; Officer Pacini, *see id.* at 397; Officer Craig Stalker, who was also involved in the pursuit, *see id.* at 414; Officer Shawn Gilligan, who encountered Rodriguez after the shooting, *see id.* at 419; Detectives McLain, Scott, and Jasinski, *see id.* at 423, 432, 447; and Alan Greenspan, the firearms examiner from the Broward Sheriff's Office, *see id.* at 474.

The jury found Kleckley guilty of Count One—attempted first-degree murder—and specifically found that, "in the course thereof," he "discharged a firearm inflicting great bodily harm." Verdict [ECF No. 52-1] at 13. It also found Kleckley guilty of Count Two—shooting into an occupied vehicle. *See id.* at 15.

**State-Court Proceedings.** The trial court sentenced Kleckley to life in prison on Count One and to a concurrent thirty-year, habitual-felony-offender sentence on Count Two. *See* Judgment and Sentence [ECF No. 52-1] at 19–30. Kleckley's life sentence on Count One was imposed under Florida's "10-20-Life" firearm-enhancement statute, *see* FLA. STAT. § 775.087, because of the jury's firearm finding, *see* Sentencing Notes [ECF No. 52-1] at 18. The Fourth District Court of Appeal ("Fourth DCA") affirmed. *See Kleckley v. State*, 787 So. 2d 868 (Fla. 4th DCA 2001).

Eight years later, in 2009, the Fourth DCA reversed only the summary denial of Kleckley's challenge to his habitual-offender sentence on Count Two and remanded "for the attachment of record portions conclusively refuting his claim or for resentencing." *Kleckley v. State*, 4 So. 3d 1290, 1291 (Fla. 4th DCA 2009).

In April 2010, the trial court resentenced Kleckley on Count Two and reimposed the same thirty-year term. *See* Resentencing Transcript [ECF No. 53-2] at 4–16. At the resentencing hearing, the court repeatedly explained that "Count One is not in play here," *id.* at 7:23–24, 26:3–4, and that it was "going to leave [the] sentence on Count One unchanged," *id.* at 16:14–15. In October 2012, Kleckley

filed a state postconviction motion, advancing (among others) the seven claims that are now before us. *See* Rule 3.850 Motion [ECF No. 52-4] at 1–52. The trial court denied that motion, *see* Order Denying Rule 3.850 Motion [ECF No. 52-4] at 193, and the Fourth DCA affirmed, *see generally Kleckley v. State*, 2016 WL 3751181 (Fla. 4th DCA July 16, 2016).

**This Case.** Kleckley filed this Petition on December 3, 2019, raising eleven grounds for habeas relief. *See generally* Petition. We denied four of those grounds on the merits and dismissed the other seven as untimely. *See* Order Denying Petition at 1–6. On July 30, 2025, the Eleventh Circuit reversed our timeliness ruling and remanded for us to adjudicate Kleckley's seven remaining grounds. *See* Eleventh Circuit Opinion at 17–18. The parties have since re-briefed them. *See generally* Resp.; Reply. This Order follows.

## THE STANDARD

### I. The Antiterrorism and Effective Death Penalty Act ("AEDPA")

AEDPA instructs district courts to deny any claim that was "adjudicated on the merits" in a state-court proceeding unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Harrington v. Richter*, 562 U.S. 86, 97–98 (2011) (summarizing 28 U.S.C. § 2254(d)–(e)). To have "adjudicated [the claim] on the merits," the state court need not have issued any kind of formal opinion or even outlined its reasoning. *Id.* at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). Rather, when a state court doesn't articulate its reasons for the denial, the federal court must "'look through' the unexplained decision to the last related state-court decision that does provide a rationale" and "then presume that the

unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). "Clearly established Federal law" means "the holdings, as opposed to the dicta, of [the United States Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). To be "contrary to clearly established federal law, the state court must either (1) apply a rule that contradicts the governing law set forth by Supreme Court case law, or (2) reach a different result from the Supreme Court when faced with materially indistinguishable facts." *Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010) (cleaned up).

For "a state court's application of [Supreme Court] precedent" to be "unreasonable, the state court's decision must have been more than incorrect or erroneous. The state court's application must have been objectively unreasonable." *Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003) (cleaned up). "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." *Richter*, 562 U.S. at 101. "And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice. To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (cleaned up).

Section 2254(d) similarly prohibits federal judges from reevaluating a state court's factual findings unless those findings were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). To establish that a state court's factual findings were unreasonable, "the petitioner must rebut 'the presumption of correctness [of a state court's factual findings] by clear and convincing evidence.'" *Ward*, 592 F.3d at 1155–56 (quoting 28 U.S.C. § 2254(e)(1)). "[E]ven if a petitioner successfully carries his burden under

§ 2254(e)(1)—showing by clear and convincing evidence that a particular state-court factual determination was wrong—he does not necessarily meet his burden under § 2254(d)(2): Even if the state court made a clearly erroneous factual determination, that doesn't necessarily mean the state court's 'decision' was 'based on' an 'unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022) (en banc) (quoting 28 U.S.C. § 2254(d)(2)). Indeed, habeas relief is not warranted "even if some of the state court's individual factual findings were erroneous—so long as the decision, taken as a whole, doesn't constitute an unreasonable determination of the facts and isn't based on any such determination." *Ibid.* (cleaned up).

"AEDPA's standard is intentionally difficult to meet." *Woods*, 575 U.S. at 315 (cleaned up). When reviewing state criminal convictions on collateral review, "federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong. Federal habeas review thus exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 316 (cleaned up).

Even if a petitioner meets AEDPA's "difficult" standard, he must still show that any constitutional error had a "substantial and injurious effect or influence" on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). The *Brecht* harmless-error standard requires habeas petitioners to prove that they suffered "actual prejudice." *Mansfield v. Sec'y, Dep't of Corr.*, 679 F.3d 1301, 1307 (11th Cir. 2012). As the Supreme Court has explained, while the passage of AEDPA "announced certain new conditions to [habeas] relief," it didn't eliminate *Brecht*'s actual-prejudice requirement. *Brown v. Davenport*, 596 U.S. 118, 134 (2022). In other words, a habeas petitioner must satisfy *Brecht*, even if AEDPA applies. *See id.* at 134–35 ("[O]ur equitable precedents remain applicable 'whether or not' AEDPA applies." (citing *Fry v. Pliler*, 551 U.S. 112, 121 (2007))). In short, a "federal court must

*deny* relief to a state habeas petitioner who fails to satisfy either [*Brecht*] or AEDPA. But to *grant* relief, a court must find that the petitioner has cleared both tests." *Ibid.* (emphasis in original); *see also Mansfield*, 679 F.3d at 1307 ("[A] habeas petition cannot be successful unless it satisfies both [AEDPA] and *Brecht*.").

**II. Ineffective Assistance of Counsel**

To prevail on an ineffective-assistance claim, a petitioner must show "both deficient performance and prejudice." *Clark v. Att'y Gen., Fla.*, 821 F.3d 1270, 1283 (11th Cir. 2016) (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984)). In other words, he must establish "that counsel's representation fell below an objective standard of reasonableness" and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694.

Our review of counsel's performance is "highly deferential." *Id.* at 689. We "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and we must evaluate the challenged conduct "from counsel's perspective at the time." *Ibid.* That rule is critical because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence." *Ibid.* As for prejudice, it requires more than a showing that counsel's error "had some conceivable effect on the outcome." *Id.* at 693. A petitioner must establish "a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

We needn't address both *Strickland* prongs when one is dispositive. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice," the Supreme Court has instructed, "that course should be followed." *Id.* at 697; *see also Hall v. Head*, 310 F.3d 683, 691 (11th Cir. 2002) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong.").

## DISCUSSION

In Grounds Four through Ten, Kleckley alleges: (1) that his lawyer was ineffective for failing to object to a verdict form that omitted a no-firearm option and deprived the jury of its supposed "pardoning power" ("Ground Four"), Petition at 8–9; (2) that his lawyer failed to renew his objection to a "tainted jury panel" after a prospective juror said that "common sense tells me that there's guilt involved here" ("Ground Five"), *id.* at 9–10; (3) that the verdict form improperly omitted an attempted-murder-without-a-firearm option, even though that lesser offense was contemplated by the oral instructions ("Ground Six"), *id.* at 10–11; (4) that the trial court violated the Double Jeopardy Clause when it used "the same firearm and great bodily harm" to support both the conviction and sentence on Count Two and the enhancement for Count One ("Ground Seven"), *id.* at 12–14; (5) that his lawyer was ineffective for not retaining a fingerprint expert who, Kleckley surmises, would have shown that he "was never in the car" ("Ground Eight"), *id.* at 14–15; (6) that his lawyer was ineffective for not retaining a hair analyst whose DNA testing, Kleckley speculates, would have shown that Kleckley "was not [the] perpetrator" ("Ground Nine"), *id.* at 15–16; and (7) that his arrest lacked probable cause because, among other things, it relied on photographs that Kleckley characterizes as "tampered evidence" and whose "veracity" and "accuracy" were never established ("Ground Ten"), *id.* at 16. We'll address—and reject—each ground in turn.

Before we do, though, we'll clarify one thing. The parties focus much of their attention on the doctrines of exhaustion and procedural default. *See, e.g.*, Resp. at 16 (arguing that Ground Four "is procedurally defaulted because Kleckley did not raise it in a timely [R]ule 3.850 motion" and that "the independent and adequate state procedural bar doctrine applies and bars this Court from reaching the merits"); Reply at 3–5 (responding that, under *Martinez v. Ryan*, 566 U.S. 1 (2012), "any procedural default of [Grounds 4] through [Ten] is excused"). We won't spend time on either. Section 2254 allows us to deny a claim "on the merits, notwithstanding the failure of the applicant to exhaust the remedies

available in the courts of the State." 28 U.S.C. § 2254(b)(2); *see also Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (recognizing that courts can bypass a procedural-default question when the claim is more "easily resolvable against the habeas petitioner" (citation omitted)). And "courts can . . . deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

We'll therefore assume without deciding that Kleckley has exhausted his remaining seven claims, that those claims haven't been defaulted, and that *de novo* review governs each of those claims. Even granting him all this, however, each claim fails on the merits.

**I. Ground Four**

In Ground Four, Kleckley claims that his trial lawyer was ineffective for failing to object to a verdict form that omitted the option of attempted first-degree murder *without* a firearm enhancement. *See* Petition at 8–9 ("[N]o option was available on the verdict form to find the Petitioner guilty of attempted first-degree murder without the enhancement provision."). Kleckley insists that this omission deprived the jury of its "pardoning power" and that "there was a possibility the jury would have found [him] guilty without the enhancement provision." *Id.* at 9. What Kleckley is saying, in so many words, is that, with this option on the verdict form, the jurors *might* have disregarded their oath and returned a lawless compromise verdict. As this summation should make plain, Ground Four fails because Kleckley cannot rely on his hoped-for juror misconduct to sustain his claim.

**a. Background**

Before closing arguments, the trial judge, the prosecutor, and defense counsel discussed the verdict form—specifically, how it would require the jury to make its firearm findings. The prosecutor explained that the jury had to decide whether Kleckley "possessed the firearm, discharged it[,] and caused great bodily harm." Trial Tr. at 498:5–6. Kleckley's lawyer, in turn, agreed that it was for the

jury "to make that determination, not the [c]ourt," because "[i]t is a factual determination made by a jury versus the [j]udge." *Id.* at 498:9–12. The trial judge agreed that "the option of finding whether or not the firearm was discharged" "should be in the [v]erdict [f]orm[.]" *Id.* at 499:22–24. After further discussion, the judge concluded as follows: "I'm not going to give a special instruction. I think that the [v]erdict [f]orm itself is self-explanatory." *Id.* at 503:7–9.

The trial court then gave the jury the following general instruction, distinguishing between crimes committed with and without a firearm:

> Now if you find that the defendant committed the crime charged, or any lesser included offenses, and you also find that during the commission of the crime[,] the defendant either possessed, discharged, or discharged, inflicting great bodily harm, with a firearm, you should find the defendant guilty of the crime charged or any lesser included offense as the evidence may justify with the aggravating circumstance noted on the Verdict Form.
>
> Now, if you find only that the defendant committed the crime charged or any lesser included crime, but did not possess, discharge, or discharge inflicting great bodily harm with a firearm, then you should find the defendant guilty only of the crime charged or the lesser included crime as the evidence may justify.

*Id.* at 583:22–584:13.

But the verdict form didn't include an option for attempted first-degree murder without a firearm. It told the jury to "check only one" and then offered attempted first-degree murder together with (1) discharge causing great bodily harm, (2) discharge, or (3) possession—followed by some lesser-included offenses and an option for acquittal. *Id.* at 597:22; *see also* Verdict at 13–15. The jury selected the first and most aggravated option. Specifically, it found Kleckley "guilty of Attempted Murder in the First Degree with a Firearm, as charged in the Information," and it separately found that "in the course thereof" he "discharged a firearm inflicting great bodily harm." Verdict at 13. As we've said, the jury separately found Kleckley guilty of Count Two: "Shooting at or into an Occupied Vehicle." *Id.* at 15.

**b. Analysis**

Kleckley says that he was prejudiced within the meaning of *Strickland* because the verdict form omitted the option of attempted first-degree murder *without* a firearm—which he insists, without any evidence, the jury *would have* selected *even though* it *twice* found that Kleckley had discharged the firearm. This claim borders on frivolity.

"[J]urors . . . take an oath to follow the law as charged, and they are expected to follow it." *United States v. Powell*, 469 U.S. 57, 66 (1984). In deciding whether a criminal defendant has shown *Strickland* prejudice, we must "presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law." *Strickland*, 466 U.S. at 694. Indeed, the Supreme Court has instructed us to exclude "the possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like" because "[a] defendant has no entitlement to the luck of a lawless decisionmaker[.]" *Id.* at 695.

That's why the Eleventh Circuit has repeatedly rejected jury-pardon theories of prejudice like the one Kleckley advances here, because we cannot assume that a jury would "disregard[ ] its oath and violate[ ] its instructions" to reach a verdict out of "mercy or leniency." *Crapser v. Sec'y, Dep't of Corr.*, 855 F. App'x 626, 628 (11th Cir. 2021) (rejecting a jury-pardon prejudice theory even though the same jury had returned a lesser-included verdict on a companion count, because any leniency would've amounted to a "jury pardon" rather than "reasonable doubt respecting guilt"); *see also Huss v. Sec'y, Fla. Dep't of Corr.*, 2022 WL 16551634, at *1–3 (11th Cir. Oct. 31, 2022) (finding no *Strickland* prejudice where the defendant's lawyer didn't object to a manslaughter instruction that "failed to indicate to the jury that the State did not have to prove" intent, because the jury convicted the defendant of second-degree murder, and he didn't challenge the supporting evidence, leaving only "jury nullification or pardon[,]" which "[could not] form the basis for *Strickland* prejudice"); *Bell v. McNeil*, 353 F. App'x 281, 286 (11th Cir. 2009) (finding no *Strickland* prejudice where the defendant's lawyer didn't ask for

a criminal-mischief instruction and the jury convicted the defendant of first-degree arson "as charged," because evidence that the fire was "intentionally started in four different areas" meant that only a "jury pardon" could've produced a lesser verdict (cleaned up)). This basic and commonsense principle squarely resolves Ground Four.

But here's the thing: Kleckley's case is even weaker than the argument appeared in the cases we've just cited because, as we've seen, his jury in fact showed *no* leniency on *any* count. The trial court instructed the jury that it should find that a firearm was used only "as the evidence may justify[.]" Trial Tr. at 583–84. After deliberating, the jury didn't just find possession or discharge on Count One—it expressly found that Kleckley had "discharged a firearm inflicting great bodily harm." Verdict at 13 (emphasis added). And it then doubled down on this firearm finding in Count Two—where it expressly concluded that Kleckley had fired a firearm into or at an occupied vehicle. *See id.* at 15. The jury thus *necessarily rejected*, on two separate occasions, the possibility that the attempted murder occurred *without* a firearm. Kleckley thus cannot show any reasonable likelihood that the jury would have found him guilty of committing the offense charged in Count One *without* a firearm.

Setting the jury's findings aside for a moment, the record contains no basis for any reasonable jury to conclude that "the result of the proceeding would have been different" if the court had included a without-firearm option on the verdict form. *Strickland*, 466 U.S. at 694. The evidence, after all, was undisputed that, whoever committed the offense, he committed it *with* a firearm. The victim, Rodriguez, testified that Kleckley "pulled out a gun" and "started shooting"; Cobb, an eyewitness, described the same gunfire; and there was no contesting the fact that Rodriguez actually sustained gunshot wounds to his leg and forearm. Trial Tr. at 254–55, 315–16. Indeed, the evidence on this point was so overwhelming that the defense's theory at trial wasn't that no shooting had occurred—it was, rather, that the witnesses had identified the wrong man as the shooter. *See* Trial Tr. at 534:16–17 (arguing to the jury that "all you . . . have is two good friends saying the person who did this is

Robert Kleckley"). Kleckley thus hasn't explained how the jury could've lawfully found that the attempted murder occurred *without* a firearm.[3]

The *Strickland* test asks us to determine whether Kleckley's lawyer deprived him of "a fair trial, . . . whose result is reliable," *Strickland*, 466 U.S. at 687, and it requires us to exclude "the possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like," *id.* at 695. But Kleckley asks us to do the opposite—to find a reasonable probability of a different outcome based only on his unsupported speculation that the jurors might have been willing to ignore their oath. That argument necessarily fails. We therefore **DENY** Ground Four on the merits.

**II. Ground Five**

In Ground Five, Kleckley argues that his lawyer was ineffective because he failed to renew a motion to strike the venire after a prospective juror (a Mr. Klug) said that "common sense tells me that there's guilt involved here." Petition at 9. Kleckley also cherry-picks, without proper context, his lawyer's later reference to the phrase "where there's smoke there's fire" and, based on this cherry-picking, insists that his lawyer somehow "bolstered" Mr. Klug's prejudice and thus "admitted [Kleckley's] guilt." *Id.* at 10. As we'll show, Ground Five fails because Kleckley's lawyer confronted (rather than endorsed) the offending remark—and because no biased juror was permitted to deliberate in Kleckley's trial.

[3] Kleckley's cases don't change our view. For example, he relies on *Crace v. Herzog*, 798 F.3d 840 (9th Cir. 2015), for the proposition that omitting a lesser option is itself prejudicial because it "can prevent a jury from questioning or compromising on the greater charge." Reply at 8 (citations omitted). But *Crace* rested on the assumption that the jury "could 'rationally' have found conviction on a lesser included offense to be the verdict best supported by the evidence." *Crace*, 798 F.3d at 849 (citing *Keeble v. United States*, 412 U.S. 205, 213 (1973)). As we've detailed, however, that's just not true in our case. The jury found that Kleckley had *both* "discharged a firearm inflicting great bodily harm," Verdict at 13, *and* fired at an occupied vehicle, *see id.* at 15, so Kleckley's preference for the omitted option would have required the jury to contradict a finding it already made *twice*.

**a. Background**

During voir dire, the prosecutor asked prospective jurors whether there was anything he and Kleckley's lawyer should know about their "abilities to be fair and impartial[.]" Trial Tr. at 172:9–13. One venire member, Mr. Klug, answered with this:

> Yes. You ask about common sense. You want us to bring this into the courtroom. I assume that man is not sitting over there for his health, and the Judge, and common sense tells me that there's guilt involved here.

*Id.* at 173:12–17.

The trial judge immediately told Mr. Klug that "Mr. Kleckley is presumed innocent" and that "[t]he State of Florida has the burden of proving the defendant's guilt beyond a reasonable doubt." *Id.* at 173:21–174:8. When the judge asked whether Mr. Klug could follow those rules, Mr. Klug answered: "I have to say no." *Id.* at 174:9.

Kleckley's lawyer then moved "to strike th[e] entire panel." *Id.* at 174:16–17. He argued that Mr. Klug had told the venire that Kleckley "has to be guilty because the man wouldn't be here if he didn't do anything," and he insisted that the comment couldn't "be cured." *Id.* at 174–75. The trial court denied this motion. *See id.* at 175.

Later, when speaking to the venire, Kleckley's lawyer brought up Mr. Klug's statements—but he did so only to *rebut* them. "Right now," he explained, "I'm going to deal with something that this gentleman brought up. You know, you're [gesturing at Mr. Klug] not the only one who thinks that, okay, where there's smoke there's fire. He wouldn't be here if he didn't do something wrong." *Id.* at 181. Kleckley's lawyer then questioned Mr. Mangan—another prospective juror and a police officer of 25 years—about whether innocent people are sometimes arrested and convicted. *See id.* at 181–83. Mr. Mangan answered that "there's a lot of people that are convicted and go to the penitentiary and it turns out they are not guilty because of DNA tests," that "[e]yewitness accounts are obviously incorrect," and that a person isn't "necessarily automatically guilty because they've been arrested." *Id.*

at 182:15–22. Kleckley's lawyer then asked the rest of the panel whether they agreed with "what this gentleman [referring to the former officer] said," noting Mr. Mangan's law-enforcement experience. *Id.* at 182. Kleckley's lawyer then walked the venire through examples of cases in which multiple eyewitnesses had identified the *wrong* person, *id.* at 183—thus proving that, in the law, where there's smoke, there isn't necessarily fire.

Finally, before jury selection ended, Kleckley's lawyer asked whether anyone had "any reservations" about "the ability to give Robert Kleckley a fair trial." *Id.* at 198:3–12. In response, each of the six jurors who ultimately sat on Kleckley's jury said that he or she had no such reservation. *See id.* at 210–11, 217–18. In the end, Mr. Klug was not selected, and the record identifies no seated juror who suggested that Kleckley's mere presence in the courtroom proved (or even intimated) his guilt. *See id.* at 172–218.

**b. Analysis**

Nevertheless, Kleckley contends that his lawyer was ineffective for "fail[ing] to renew [his] objection to strike" the allegedly "tainted jury panel," and that his lawyer "added to the error" when he "bolstered [Mr. Klug's] prejudicial statements and admitted [Kleckley's] guilt." Petition at 9. For four reasons, he's wrong.

*First*, Kleckley identifies no biased juror who actually sat for his trial. The Sixth Amendment guarantees a defendant an impartial jury, and "[a]ny claim that the jury was not impartial . . . must focus . . . on the jurors who ultimately sat." *Ross v. Oklahoma*, 487 U.S. 81, 86 (1988). During voir dire, Mr. Klug candidly admitted that he couldn't apply the presumption of innocence—and, as a result, he didn't serve. *See* Trial Tr. at 173–75, 218. No other juror expressed agreement with Mr. Klug. In other words, the only juror who said that he couldn't apply the presumption of innocence *didn't* participate in the trial. And no seated juror ever endorsed what Mr. Klug said. On the contrary, all agreed to follow the court's instructions, which were that Kleckley was "presumed innocent" and that the State

had to prove his guilt "beyond a reasonable doubt." *Id.* at 173–74; *see, e.g.*, *United States v. Hernandez*, 2026 WL 2209823, at *6 (11th Cir. July 31, 2026) (holding that any error concerning "the court's denial of [the defendant]'s challenge to a potential juror" was harmless because the defendant couldn't "demonstrate that the jury that sat was actually biased" (citing *Spivey v. Head*, 207 F.3d 1263, 1273 (11th Cir. 2000))).

*Second*, we don't think Mr. Klug's comment tainted the entire panel. Of course, due process requires jurors who are "capable and willing to decide the case solely on the evidence before [them]," *Smith v. Phillips*, 455 U.S. 209, 217 (1982), and a juror may serve only if he can "lay aside his impression or opinion and render a verdict based on the evidence presented in court," *Irvin v. Dowd*, 366 U.S. 717, 723 (1961) (citations omitted). The Eleventh Circuit requires voir-dire procedures that create "a reasonable assurance that prejudice will be discovered if present." *United States v. Hill*, 643 F.3d 807, 836 (11th Cir. 2011) (cleaned up). This inquiry typically asks whether the court's "overall examination" of the jurors, "coupled with [its] charge to the jury," satisfied constitutional guarantees to a fair trial. *United States v. Tegzes*, 715 F.2d 505, 507 (11th Cir. 1983) (cleaned up).

The procedures in Kleckley's trial supplied that "reasonable assurance." *Hill*, 643 F.3d at 836. The trial court immediately corrected Mr. Klug, telling the panel that Kleckley "is presumed innocent" and that the State bore the burden of proving Kleckley's guilt "beyond a reasonable doubt." Trial Tr. at 173–74. And Kleckley's lawyer later asked the jurors who ultimately sat whether they had "any reservations" about giving Kleckley "a fair trial." *Id.* at 198:3–10. Each said no. *See id.* at 209–10. The judge then reiterated these admonitions in his final instructions to the jury. *See id.* at 590–92. This process was more than adequate to educate the venire about the requirements of the Due Process Clause and to uncover any prejudices the jurors may have harbored. *See, e.g.*, *Tegzes*, 715 F.2d at 508 (affirming refusal to quash the panel after a prospective juror disclosed her son's overdose, because the court had questioned the others about their "experiences or opinions towards drugs" and saw "no

reason to believe" that any juror tainted by the remark would not have reported it, rendering any broader taint "highly speculative"); *United States v. Tosca*, 848 F. App'x 371, 374 (11th Cir. 2021) (affirming the defendant's conviction where a lone prospective juror who admitted racial bias during voir dire was removed, because the claim that the exchange "chilled" other jurors was "highly speculative" and because "no venire member indicated any potential prejudice that required further inquiry" (citations omitted)); *United States v. Bergman*, 852 F.3d 1046, 1067 (11th Cir. 2017) (affirming the district court's refusal to strike the jury panel where the magistrate judge's voir dire questions "revealed that [Juror Number 12] could serve fairly" after she explained how her "past experiences would affect her decision-making" and no other potential jurors were prevented from "speaking about their biases").

*Third*, Kleckley's lawyer couldn't have performed ineffectively by failing to renew his motion to strike the venire because any such motion would have failed. After all, the trial court had *already* denied the motion to strike. *See* Trial Tr. at 174–75. Since a reasonable lawyer would've correctly perceived a renewed motion on the same basic grounds as "futile," Kleckley's counsel cannot be faulted for not moving to strike the venire again. *Zakrzewski v. McDonough*, 455 F.3d 1254, 1260–61 (11th Cir. 2006); *see also Freeman v. Att'y Gen., Fla.*, 536 F.3d 1225, 1233 (11th Cir. 2008) ("A lawyer cannot be deficient for failing to raise a meritless claim.").[4]

*Fourth*, Kleckley's lawyer's later statements about Mr. Klug's comments were perfectly reasonable and well-articulated. *Strickland* doesn't grade a lawyer by isolating one sentence or

[4] Kleckley also briefly argues that his lawyer's failure to renew the motion "waived the issue for appellate review" and that there was a "reasonable likelihood of a more favorable outcome on appeal had the claim been preserved." Petition at 10. We disagree. A preserved claim would have failed on direct appeal for the same reasons it fails now—*viz.*, because Mr. Klug never served, the trial judge corrected him in front of the panel, Kleckley's lawyer probed the remaining jurors for any residual bias, and every juror who was ultimately seated disclaimed "any reservations" about giving Kleckley a fair trial. Trial Tr. at 173–75; *see also id.* at 181–83, 210–11, 218. In other words, Kleckley lost nothing on appeal.

argument; it asks whether that lawyer's conduct fell outside "the wide range of reasonable professional assistance." 466 U.S. at 689. And "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690. So, while Kleckley's lawyer *did* remind the jurors about what Mr. Klug said, he did so for the justifiable purpose of *rebutting* any bias Klug's comments may have left in their wake. Viewed in this important context, the lawyer invoked the phrase "where there's smoke there's fire" in his understandable effort to *weaken* its underlying premise, and his follow-up questions elicited helpful answers from a veteran police officer about the reality that, sometimes, innocent people are arrested, "[e]yewitness accounts are obviously incorrect," and DNA evidence has exonerated people who were previously convicted. Trial Tr. at 181–83. That strategic choice to take the sting out of Mr. Klug's comments—especially after the trial court declined to strike the panel—wasn't deficient. To the contrary, it's the kind of riposte we expect of seasoned, effective counsel. *See, e.g.*, *Harvey v. Warden, Union Corr. Inst.*, 629 F.3d 1228, 1243 (11th Cir. 2011) (explaining that a lawyer's actions are considered "sound trial strategy, and thus effective," if "a reasonable attorney could have taken the same actions"); *cf. Lovell v. United States*, 2018 WL 4743654, at *15 (M.D. Fla. Oct. 2, 2018) (Steele, J.) (rejecting an ineffective-assistance claim where the defendant's lawyer allegedly "bolstered" a state witness's "private sector experience with a national accounting firm" in closing because, viewed "in context," his lawyer sought to "draw the sting out" of the witness's credentials by "undermining his trustworthiness").

Since Kleckley's lawyer's performance wasn't deficient, we needn't reach the question of *Strickland* prejudice as to Ground Five. *See Spriggs v. United States*, 2022 WL 2345758, at *16 (11th Cir. June 29, 2022) ("Having concluded that Spriggs'[s] counsel's performance was not constitutionally deficient, we need not reach the question of prejudice." (citation omitted)); *Brown v. United States*, 720 F.3d 1316, 1326 (11th Cir. 2013) ("If a defendant fails to satisfy either *Strickland* prong, we need not address both."). In short, we **DENY** Ground Five on the merits.

**III. Ground Six**

In Ground Six, Kleckley recasts the verdict-form issue from Ground Four as a claim of trial-court error. This time, Kleckley says that omitting the option of attempted first-degree murder *without* a firearm from the verdict form "unconstitutionally directed a verdict" on the firearm finding and created "structural error." Petition at 11–12. We disagree.

An erroneous instruction violates due process only when it "so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). It isn't enough that an instruction or form was "undesirable, erroneous, or even 'universally condemned.'" *Cupp*, 414 U.S. at 146. We must evaluate the challenged language "in the context of the instructions as a whole and the trial record," not "in artificial isolation." *Estelle*, 502 U.S. at 72 (cleaned up); *see also United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000) (explaining that a conviction shouldn't be reversed on the basis of a jury charge unless "the issues of law were presented inaccurately, or the charge improperly guided the jury in such a substantial way as to violate due process" (cleaned up)).

Kleckley's right about one thing: The verdict form and the trial court's oral instructions weren't a perfect match. The trial court told the jury it could find that a firearm was used *only* "as the evidence may justify," Trial Tr. at 584:7–13, contemplating that the jury could, in theory, render a guilty verdict *without* a firearm finding. But the verdict form didn't offer a box for that. Its thirteen options on Count One ran from attempted first-degree murder with discharge and injury (option A), through the same offense with discharge or mere possession alone (options B and C), followed by lesser offenses with their own firearm gradations (options D through L), and not guilty (option M). *See* Verdict at 13. Every guilty option came with a finding that a firearm was present in some way. *See ibid.*

But Kleckley's first argument fails because this mismatch didn't produce a "directed verdict." After all, a directed verdict takes the decision away from the jury. This form did the *opposite*. It let the

jury acquit outright, find only that Kleckley possessed a firearm, or find that he discharged one without injuring anyone. The jury took none of those paths. It instead chose the most aggravated option—"discharged a firearm inflicting great bodily harm," *ibid.*—and then found on Count Two that Kleckley fired "at or into an occupied vehicle," *id.* at 15. A jury that *could* have chosen not to convict and instead convicted on the *most serious* available finding hasn't had a verdict *directed* for it. *Cf. Sullivan v. Louisiana*, 508 U.S. 275, 280 (1993) (describing the Sixth Amendment's requirement as a "*jury* verdict of guilty-beyond-a-reasonable-doubt" (emphasis added)).

More fundamentally, the jury made the finding the Constitution requires. The trial court told the jurors that each "material allegation in the Information" had to be proved "beyond a reasonable doubt," Trial Tr. at 591, and the jury expressly found that Kleckley "discharged a firearm inflicting great bodily harm," Verdict at 13. Whatever the form's shortcomings, it plainly required the State to establish the firearm discharge within the strictures of our justice system's highest standard of proof. And, as we explained in analyzing Ground Four, the jury's express discharge-and-injury finding makes it "logical to conclude" that adding the omitted option wouldn't have changed the verdict. *See, e.g.*, *Henderson v. Kibbe*, 431 U.S. 145, 153, 156–57 (1977) (holding that the omission of a causation instruction didn't warrant habeas relief, where the judge told the jury that every element, including causation, had to be proved beyond a reasonable doubt, and noting that the jury's recklessness finding "necessarily included" a finding of foreseeability, making the chance of a different verdict "too speculative").

As for Kleckley's second argument, the minor discrepancy between the instructions and the verdict form wasn't "structural." Petition at 11–12. Structural errors occupy a "very limited class of cases" in which the defect "infect[s] the entire trial process" and renders the trial fundamentally unfair. *Neder v. United States*, 527 U.S. 1, 8 (1999) (cleaned up). Even the complete omission of an offense element from the jury instructions is subject to harmless-error review because it doesn't "necessarily

render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Id.* at 9. Here, the trial court correctly required proof "beyond a reasonable doubt," Trial Tr. at 581–84, and the jury returned a specific finding that the firearm was discharged, *see* Verdict at 13. There was nothing unreliable about that process. *See, e.g.*, *United States v. Wilkins*, 2024 WL 706152, at *4 (11th Cir. Feb. 21, 2024) (finding no structural error as a result of the mismatch between instructions that required a "guilty or not guilty" verdict and a form using "yes" or "no," because, read together, they still required "the ultimate finding of guilt required by the Fifth and Sixth Amendment[s]").

Kleckley's reliance on *Sullivan* is misplaced. *See* Reply at 10–11 (citing *Sullivan* for the proposition that the omission was "a structural error that infected the entire trial process" (cleaned up)). In *Sullivan*, the trial court had defined "reasonable doubt" for the jury as "grave uncertainty," "actual substantial doubt," and "moral certainty"—which had created a risk that jurors would convict on "a degree of proof below" the constitutional minimum. *Sullivan*, 508 U.S. at 277. That defective instruction therefore produced "no jury verdict within the meaning of the Sixth Amendment" and left "no object" for harmless-error review. *Id.* at 280. *But see Neder*, 527 U.S. at 11, 17 (finding harmless the omission of an offense element from the jury instructions, because the element was "uncontested and supported by overwhelming evidence" and distinguishing *Sullivan* by explaining that a defective reasonable-doubt instruction "vitiates all the jury's findings," whereas the omission of one element does not). In stark contrast to the unique situation the Supreme Court faced in *Sullivan*, Kleckley's jury received a proper instruction on the burden of proof and thus unambiguously made its firearm finding beyond a reasonable doubt—so the defective form didn't produce structural error.

In any event, an instructional error warrants habeas relief only if it had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.[5] This standard requires the petitioner to prove "actual prejudice," *Mansfield*, 679 F.3d at 1307 (quoting *Brecht*, 507 U.S. at 637), and authorizes relief only when the court has "grave doubt" about the error's effect, *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). An omission is harmless when "the jury verdict would have been the same absent the" omission. *Neder*, 527 U.S. at 17. And when, as here, the challenge concerns an omission, a petitioner's burden is "especially heavy" because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson*, 431 U.S. at 155.

In Kleckley's case, the firearm issue was uncontested. As we explained in discussing Ground Four, the defense disputed only the *identity* of the shooter—it never suggested that the person who shot Rodriguez did so without a gun. *See* Trial Tr. at 534. And that's because the evidence on this point was clear. Rodriguez testified that Kleckley pulled out a gun, shot him, and "continuously sh[ot] at [his] truck" as he drove away, and Cobb said that he saw Kleckley "reach" for a gun, "heard shots give out[,]" and then saw that Rodriguez had been shot. *Id.* at 254–55, 316, 318. Rodriguez had, in fact, been shot in his "arm" and "leg." *Id.* at 255. So, any error stemming from the omission was harmless.[6] *See, e.g.*, *Owens v. McLaughlin*, 733 F.3d 320, 328–29 (11th Cir. 2013) (finding an improper burden-shifting venue instruction harmless under *Brecht* where blood in a car found in Georgia had

---

[5] *Brecht* applies to Kleckley's claim irrespective of our application of AEDPA deference. *See Fry v. Pliler*, 551 U.S. 112, 121–22 (2007) (holding that *Brecht* governs "whether or not the state appellate court recognized the error and reviewed it for harmlessness" (citation omitted)); *see also California v. Roy*, 519 U.S. 2, 5–6 (1996) (per curiam) (applying *Brecht* to an instructional omission).

[6] Although not at issue here, the evidence that Kleckley was the shooter was likewise overwhelming. Rodriguez called Kleckley "[t]he person that shot me" in court and later identified him in a photo lineup; Cobb likewise identified "Mr. Kleckley" in court and in a separate lineup. *Id.* at 249, 311, 455, 468. Plus, officers recovered from the Oldsmobile at least one photograph of Kleckley, as well as an FP&L letter addressed to "Robert Kleckley." *Id.* at 426–27; *see also id.* at 439–41, 461–62. On this record, then, any mismatch between the instruction and the verdict form couldn't have had a "substantial and injurious effect" on the verdict.

"overwhelmingly demonstrated" that the victim was killed there, so the record was not "so evenly balanced" as to create "grave doubt").

In short, we have no "grave doubt" that the missing option affected the verdict, *O'Neal*, 513 U.S. at 436, because the jury selected—and the evidence overwhelmingly supported—the most aggravated firearm finding the verdict form supplied. Kleckley therefore wasn't prejudiced by the error, and an error that produces no "actual prejudice" can't support habeas relief. *Mansfield*, 679 F.3d at 1307. We therefore **DENY** Ground Six.

**IV. Ground Seven**

In Ground Seven, Kleckley says that the State punished him twice for the same firearm use and bodily harm: once in his conviction for shooting into an occupied vehicle (Count Two) and a second time by enhancing his attempted first-degree murder charge. *See* Petition at 12–13. As Kleckley puts it, he "could not be punished twice for the use of the same firearm and the same bodily harm in both offenses." *Id.* at 13. He calls this "impermissible 'double counting'" and invokes the Double Jeopardy Clause of the Fifth Amendment. Reply at 11. Ground Seven is meritless.

The Double Jeopardy Clause protects against "multiple punishments for the same offense." *Brown v. Ohio*, 432 U.S. 161, 165 (1977) (citations omitted). When two punishments are imposed after one trial, however, the Double Jeopardy Clause "does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter*, 459 U.S. 359, 366 (1983). So, if the legislature has "specifically authorize[d] cumulative punishment under two statutes," a court may impose both punishments even when the same conduct violated both laws. *Id.* at 368–69.

To decide whether the legislature authorized both punishments, the Eleventh Circuit requires a "two-stage analysis[.]" *Williams v. Singletary*, 78 F.3d 1510, 1513 (11th Cir. 1996). A court first asks whether "there exists a clear legislative intent to impose cumulative punishments"; if so, the inquiry

ends. *Ibid.* If not, the court applies "the same-elements" test from *Blockburger v. United States*, 284 U.S. 299 (1932), which asks whether "each provision requires proof of a fact which the other does not," *id.* at 304 (citation omitted); *see also Williams*, 78 F.3d at 1513 (applying *Blockburger*'s "same-elements test" only absent "a clear indication of legislative intent to impose cumulative punishments"). Notably, *Blockburger* compares elements—*not* evidence. In other words, the same gunshots may satisfy one or more of the elements of both crimes; what matters is whether each crime requires proof of a fact the other does not. *See United States v. Bobb*, 577 F.3d 1366, 1372–73 (11th Cir. 2009) (requiring a "strictly textual comparison" of the elements under *Blockburger* rather than an inquiry into "the actual evidence presented at trial" (citations omitted)).

Before we get to Kleckley's arguments about the firearm, we note that his position on bodily harm plainly fails. Kleckley claims that the jury punished him twice for the "same bodily harm," Petition at 13, but the jury made that finding only once. As to Count Two, the trial court instructed the jury that the State had to prove "three elements beyond a reasonable doubt"—that (1) "the defendant shot a firearm," that (2) "he did so at, within, or into a vehicle . . . being used or occupied by any person," and that (3) "the act was done wantonly or maliciously." Trial Tr. at 588. Great bodily harm, in short, wasn't an element of this offense. And the verdict as to this count reads, in its entirety, that Kleckley is "guilty of shooting at or into an occupied vehicle, as charged in the Information." *Id.* at 620. In short, the special finding that Kleckley "discharged a firearm, inflicting great bodily harm," applied only to Count One. *Id.* at 619; *see also* Verdict at 13.

We begin our analysis of Kleckley's Double Jeopardy claim where *Williams* tells us to—asking whether Florida has "a clear legislative intent to impose cumulative punishments." *Williams*, 78 F.3d at 1513. On this issue at least, Florida law is quite clear. Section 775.021(4)(a) of the Florida Statutes provides that a defendant who commits multiple offenses "in the course of one criminal transaction or episode . . . shall be sentenced separately for each criminal offense," and that "offenses are separate

if each offense requires proof of an element that the other does not, *without regard to the accusatory pleading or the proof adduced at trial*." FLA. STAT. § 775.021(4)(a) (1999) (emphasis added). Section 775.021(4)(b) confirms that "[t]he intent of the Legislature is to convict and sentence for each criminal offense committed in the course of one criminal episode or transaction," subject to three exceptions: (1) offenses "which require identical elements of proof"; (2) offenses "which are degrees of the same offense as provided by statute"; and (3) "lesser offenses the statutory elements of which are subsumed by the greater offense." *Id.* § 775.021(4)(b). In other words, Florida has answered the legislative-intent question by authorizing cumulative punishment unless one of § 775.021(4)(b)'s exceptions applies. Attempted first-degree murder, FLA. STAT. §§ 782.04(1)(a)1, 777.04(1) (1999), and shooting into an occupied vehicle, *id.* § 790.19, aren't degrees of the same offense, so the second exception is out. And the first and third exceptions ask the same question as *Blockburger*: whether each offense requires an element the other does not.

Kleckley's two offenses satisfy that test. Attempted first-degree murder requires proof that Kleckley acted with "a premeditated design to kill" and committed an act that, but for prevention or failure, "would have resulted in the death" of the victim. Trial Tr. at 582; *see also* FLA. STAT. §§ 782.04(1)(a)1, 777.04(1) (1999) (requiring a "premeditated design to effect" death and an "act toward the commission" of the offense that "fails in the perpetration" or is prevented). Shooting into an occupied vehicle, by contrast, does not require a plan to kill or an act that nearly caused death. Instead, it requires proof that Kleckley wantonly or maliciously shot "at, within, or into" a vehicle "being used or occupied by any person." Trial Tr. at 588–89; *see also* FLA. STAT. § 790.19 (1999) (prohibiting "wantonly or maliciously" shooting "at, within, or into" a vehicle "being used or occupied by any person").

Attempted first-degree murder, meanwhile, does not require proof that the victim was in a vehicle or that Kleckley shot at or into a car. Each count therefore contains an element the other does

not. That's axiomatically *not* double jeopardy. *See, e.g.*, *United States v. Turner*, 2022 WL 4137756, at *4 (11th Cir. Sept. 13, 2022) (rejecting a double-jeopardy challenge where "the same act of robbing" two banks supported Hobbs Act and bank-robbery convictions, because the former required proof that the robbery "affects commerce" and the latter that it targets a "bank, credit union, or any savings and loan association," so "one act" could satisfy "two distinct offenses").

The firearm-enhancement finding on Count One doesn't change our analysis. The jury found that Kleckley "discharged a firearm inflicting great bodily harm," which reclassified the attempted-murder offense and fixed the applicable firearm enhancement. Verdict at 13. Florida authorized that result too. Section 775.087(1) directs that, "whenever a person is charged with a felony, *except a felony in which the use of a weapon or firearm is an essential element*," and when, during the crime's commission, "the defendant carries, displays, uses, threatens to use, or attempts to use any weapon or firearm," the felony "shall be reclassified"—"[i]n the case of a felony of the first degree, to a life felony." FLA. STAT. § 775.087(1), (1)(a) (1999) (emphasis added). Firearm use isn't an essential element of attempted first-degree murder, so the exception doesn't apply. *See Lentz v. State*, 567 So. 2d 997, 998 (Fla. 1st DCA 1990) ("[A] conviction of attempted first-degree murder does not require that the act be committed with a firearm[.]").

In any event, considering conduct at sentencing isn't the same as punishing that conduct. Consideration of a defendant's conduct at sentencing "does not result in 'punishment' for any offense other than the one of which the defendant was convicted." *Witte v. United States*, 515 U.S. 389, 397 (1995). The enhancement merely adjusted the penalty for the *attempted murder* Kleckley committed; it didn't punish him a *second* time for shooting into Rodriguez's Expedition. Lastly, even if that finding were treated as part of Count One for purposes of the same-elements test, Count One *still* required premeditated intent and an attempted killing, while Count Two *still* required an occupied vehicle. Each of these elements, as we've explained, was absent from the other count. Kleckley thus cannot show

that the Double Jeopardy Clause was violated here. *See Browning v. Sec'y, Fla. Dep't of Corr.*, 2020 WL 5350308, at *8 (M.D. Fla. Sept. 4, 2020) (Corrigan, J.) (rejecting a double-jeopardy challenge where the same gunfire supported convictions for "aggravated battery" and "shooting into a building," because the "third element of shooting into a building"—that the defendant "did so wantonly or maliciously"—"requires proof which the elements of aggravated battery do not").

Since Counts One and Two required proof of a fact the other did not, we **DENY** Ground Seven.

**V. Ground Eight**

In Ground Eight, Kleckley says that his lawyer should have retained a fingerprint expert to examine the Oldsmobile and the items recovered from it. *See* Petition at 14–15. He says that an expert "would have proven [his] innocence" by showing that his fingerprints weren't inside the car. *Id.* at 14. We're again unpersuaded.

**a. Background**

At trial, the jury heard from one of the State's two identification technicians, Susan Plunske, who photographed the Oldsmobile. *See* Trial Tr. at 344–46. When asked whether she'd also "process[ed]" the Oldsmobile "for latent fingerprints," Plunske answered, "no," explaining that she couldn't process the Oldsmobile's exterior because "[t]he vehicle itself" was wet from rain and she couldn't put a "fingerprint brush and process it" while it was wet. *Id.* at 346:4–16. Plunske testified that she instead removed "two cups" and "one bottle of spring water" from the Oldsmobile and processed *those* items for fingerprints—a series of tests that produced "negative results." *Id.* at 346:22–347:9.

She clarified, though, that the wet Oldsmobile wasn't abandoned as evidence. It "was left for the person that was going to process it when it dried off," at which point another technician would "process the entire car, the inside and out, so there[ ] [would be] no confusion." *Id.* at 355:9–12. Steven

Weathers, the State's other identification technician, later testified that he processed the Oldsmobile's interior the "next afternoon" and "wasn't able to obtain any latent[ ] prints." *Id.* at 376:18–20.

**b. Analysis**

Ground Eight fails under both *Strickland* prongs. We'll start with deficient performance: Generally, a defense lawyer must conduct enough investigation to make an informed choice, but he "need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense." *Richter*, 562 U.S. at 108 (citing *Strickland*, 466 U.S. at 691). And *Strickland* doesn't ask what the best lawyer—one with unlimited time, money, and hindsight—might have done. It just asks whether "some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Waters v. Thomas*, 46 F.3d 1506, 1518 (11th Cir. 1995) (en banc) (cleaned up). And the lawyer's choice to act as he did, like other trial decisions, receives "a strong presumption" of reasonableness. *Chandler v. United States*, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) (en banc).

In Kleckley's case, a reasonable lawyer could choose not to hire an expert to revisit fingerprint testing. The State's technicians processed the Oldsmobile's interior, along with the cups and bottle they found inside it, but each effort produced *negative* results. That process, therefore, had *already* left no fingerprint evidence tying Kleckley to the Oldsmobile. A defense fingerprint expert could have either confirmed those findings (adding nothing) or—worse—might have found fingerprints that were, in fact, Kleckley's. Given those possibilities, we think that his lawyer's choice not to hire a fingerprint expert fell within "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *see also Dorsey v. Chapman*, 262 F.3d 1181, 1186 (11th Cir. 2001) (rejecting a claim based on a lawyer's failure to call a defense expert to answer the State's dissociative-identity evidence because the choice was not "so patently unreasonable" that "no competent attorney would have chosen this strategy"); *Dingle v. Sec'y, Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007) (finding that the petitioner's lawyer was not deficient where the lawyer strategically decided not to call available expert

witnesses, which "allowed him to focus on the non-intentional nature of [the petitioner's] conduct as opposed to the cause and brutality of [the victim's] injuries" (cleaned up)); *D'Amico v. Sec'y, Dep't of Corr.*, 2014 WL 1248071, at *15–16 & n.30 (M.D. Fla. Mar. 26, 2014) (Whittemore, J.) (rejecting a claim that the petitioner's trial lawyer was ineffective for failing to call a fingerprint expert, where his lawyer chose to stress the State's "lack of evidence" rather than call an "outside" expert "to disprove what was not proved," and the petitioner thus failed "to overcome the presumption" that his lawyer's choice "to forego calling a fingerprint expert was anything other than trial strategy" (citations omitted)).

Plus, it's not as though Kleckley's lawyer overlooked the State's *lack* of evidence. While cross-examining Plunske, Kleckley's lawyer got Plunske to admit that she hadn't examined "the *interior* of the vehicle for fingerprints," even though Plunske had testified that she was unable to process only the *exterior* of the vehicle because the Oldsmobile was wet from rain. Trial Tr. at 352:23–353:1 (emphasis added). And, in his closing argument, the lawyer brought up the State's "lack of evidence[,]" arguing that "[t]here ha[d] been no proof that [the] car belong[ed] to Robert Kleckley" and emphasizing that the State hadn't produced DNA evidence. *Id.* at 533:23–534:11 (cleaned up). Kleckley insists that his lawyer should've made a different investigative choice—but, even if a lawyer's decision "appears to have been unwise in retrospect, the decision will be held to have been ineffective assistance only if it was 'so patently unreasonable that no competent attorney would have chosen it.'" *Dingle*, 480 F.3d at 1099 (quoting *Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983)). That's far from the case here.

In any event, Kleckley can't show *Strickland* prejudice. When a petitioner faults his lawyer for not presenting an expert, his burden is "heavy" because "often allegations of what a witness would have testified to are largely speculative." *Sullivan v. DeLoach*, 459 F.3d 1097, 1109 (11th Cir. 2006) (cleaned up). Kleckley predicts that an expert "would have proven" he was never in the Oldsmobile.

Petition at 15. And he insists that another "forensic examination" of the car was "essential," since his trial relied "entirely on eyewitness identification." Reply at 12 (citation omitted). But Kleckley doesn't offer an expert report, affidavit, or test result showing that another examiner could have obtained a different result. An affidavit (it's true) isn't the only way to make that showing, but a petitioner's "own assertions about whether and how a witness would have testified are usually not enough to establish prejudice[.]" *McKiver v. Sec'y, Fla. Dep't of Corr.*, 991 F.3d 1357, 1365 (11th Cir. 2021) (citations omitted). Kleckley's unsupported prediction, standing alone, therefore cannot establish any reasonable probability that the outcome of his trial would've been different had his lawyer hired a fingerprint expert. *See, e.g.*, *Finch v. Sec'y, Dep't of Corr.*, 643 F. App'x 848, 852 (11th Cir. 2016) ("Without some specificity as to the proposed expert's testimony, any assertion that an expert would testify consistently with his claims is mere speculation and does not entitle him to habeas relief."); *Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001) (rejecting an ineffective-assistance claim based on defendant's speculation that a motel witness would have rebutted testimony about the defendant's admissions, explaining that "Johnson offers only speculation that the missing witnesses would have been helpful" and that "[t]his kind of speculation is insufficient to carry the burden of a habeas corpus petitioner" (cleaned up)).

Ground Eight therefore fails because Kleckley *already had* the exculpatory fact he now says an expert should have supplied—and because Kleckley offers no evidence supporting the outcome he imagines. So, we **DENY** Ground Eight.

**VI. Ground Nine**

In Ground Nine, Kleckley maintains that his lawyer should have "subpoena[ed] [or] retain[ed] a hair analyst" to test the black hair recovered from the Oldsmobile's broken windshield. Petition at 15. He says that testing "would have weakened the State's case and proven that [he] was not the perpetrator." *Ibid.* As we'll explain, Ground Nine fails for much the same reasons as Ground Eight.

**a. Background**

Technician Weathers testified about his inspection of the Oldsmobile. On direct examination, Weathers said that he observed that "[t]he windshield . . . was broken" near the center, and he testified that he "recovered some black hair from the windshield itself." Trial Tr. at 376:25–377:3. He also viewed Kleckley's booking photograph, which showed what Weathers described as "a large bump on [Kleckley's] forehead." *Id.* at 378:18–19. When the prosecutor began asking whether the bump was "[c]onsistent with" striking the windshield, Kleckley's lawyer objected, and the trial court sustained the objection. *Id.* at 378:20–23. The jury heard no expert opinion connecting the bump to the windshield. As for the hair, the record doesn't establish whose hair it was or whether it contained usable DNA. On cross-examination, Kleckley's lawyer established that the hair had never been tested:

[Defense Counsel]: Now, this black hair that you found in the thing, did you submit it to the Broward County [crime] lab for DNA analysis?

[Weathers]: No, sir, I didn't.

[Defense Counsel]: You know DNA analysis can match hair?

[Weathers]: Yes, if they have enough hairs.

[Defense Counsel]: One good hair will do it. And we don't have a lab here that does it?

[Weathers]: Yes.

[Defense Counsel]: The Broward County crime lab does it. You guys can avail yourselves of the[ir] services?

[Weathers]: Yes.

*Id.* at 379:11–22.

Kleckley's lawyer returned to this point in his closing argument, reminding the jurors that "a fiber hair was found," that "one hair [would] give [them] the DNA," and that, despite all that, there had been "[n]o testing, right here in our Broward County lab, for DNA." *Id.* at 534:4–11.

**b. Analysis**

Kleckley again assumes that testing the hair would have exonerated him. As we've explained, however, this sort of speculation cannot establish either deficient performance or prejudice under *Strickland*.

As for deficient performance, we begin with his lawyer's decision not to hire a DNA expert. Testing the hair could have (1) excluded Kleckley, (2) produced nothing usable, or (3) tied Kleckley to the Oldsmobile. In these circumstances, a reasonable lawyer would have found the potential benefits of the first option minimal when compared with the fatal risk the third option presented—especially since the first option wouldn't have exonerated Kleckley at all: It simply would have shown that someone else had *also* been in the car, a fact the State didn't contest. Far better, a reasonable lawyer might have felt, to use the State's shoddy investigative practices against it rather than risk testing the hair and finding that it belonged to Kleckley. And that's precisely what Kleckley's lawyer did. He argued to the jury that "one hair [would] give [them] the DNA," stressed that there was "[n]o testing," and insisted that, based on the State's evidence, the case rested merely on "two good friends saying the person who did this is Robert Kleckley, and that they didn't do anything." Trial Tr. at 534:9–18. That was a reasonable use of the evidence and doesn't come close to approaching constitutionally deficient performance. *See, e.g.*, *Curry v. Sec'y, Fla. Dep't of Corr.*, 735 F. App'x 609, 612 (11th Cir. 2018) (rejecting the petitioner's claim that his lawyer was "ineffective in failing to obtain DNA test results" where his lawyer "asked for the DNA test results prior to trial," "the test was incomplete," and "[t]hen, at trial, he used their absence strategically, arguing" a lack of "physical evidence" sufficient to convict the petitioner). Kleckley notes that "[t]he State's theory was that the perpetrator's head struck the windshield, leaving hair behind." Reply at 14. But the State never got that theory to the jury, since the trial court sustained Kleckley's lawyer's objection when the prosecutor tried to tie Kleckley's forehead injury to the windshield. *See* Trial Tr. at 378:20–23.

As with Ground Eight, Kleckley also can't show prejudice. He claims that testing the hair "would have proven that [he] was not [the] perpetrator[,]" Petition at 15, but he supplies no evidence that the hair found on the windshield could yield a usable profile. And, as we've said, his unsupported speculation cannot establish *Strickland* prejudice. *See, e.g.*, *Streeter v. United States*, 335 F. App'x 859, 864 (11th Cir. 2009) (rejecting a claim that an uncalled witness wouldn't have identified the defendant where the defendant offered only her "subjective belief" and no affidavit or specific facts, because "mere speculation that missing witnesses would have been helpful is insufficient to meet [a habeas] petitioner's burden of proof" (citing *Johnson*, 256 F.3d at 1187)).

In any event, as we've hinted, even *if* the hair on the windshield wasn't Kleckley's, that fact wouldn't have *exonerated* him. At most, it would show that the hair belonged to someone else. It wouldn't tell us *how* the hair got there, who drove the Oldsmobile, or who shot Rodriguez. And the jury still would have had Rodriguez's and Cobb's positive identifications of Kleckley, *plus* the documents and photographs tying Kleckley to the Oldsmobile. Kleckley has thus fallen far short of showing "a reasonable probability" that the verdict would have been different had his lawyer hired a hair analyst. *Strickland*, 466 U.S. at 694. We **DENY** Ground Nine.

**VII. Ground Ten**

Lastly, Kleckley contends that the police lacked probable cause to arrest him because the photographs recovered from the Oldsmobile were "tampered evidence" and because their "veracity" wasn't confirmed by "the individual photographer." Petition at 16. He adds that the photographs' "accuracy" and timing weren't proven, that detectives failed to examine "hair and blood samples," and that these alleged defects violated his "substantive and procedural due process rights." *Ibid.* None of these allegations shows that officers lacked probable cause to believe that Kleckley committed the shooting.

**a. Background**

We'll briefly recount how detectives discovered the Oldsmobile and the evidence inside it—and how that investigation led to Kleckley's arrest. At about 2:00 a.m. on August 20, 1999, Officer Pacini "heard shots fired" and, after pulling into the plaza, saw two people pointing at the Oldsmobile. Trial Tr. at 398:22; *see also id.* at 400. After Officer Pacini asked, "who did the shooting," the same two witnesses "again point[ed] . . . to the same vehicle." *Id.* at 401:4–402:5. He therefore pursued the Oldsmobile until it crashed, at which point a "black male jump[ed] out of the passenger's side and r[a]n westbound." *Id.* at 406:18–20; *see also id.* at 402–03. Officer Pacini couldn't identify the runner's face, but he remembered that the man had "short dreads." *Id.* at 408:24.

Detective McLain testified that officers then "secured a Search Warrant for the suspect vehicle," which had been brought to the police compound, before searching "the interior passenger compartment including glove box and the trunk." *Id.* at 426:9–10. Detective Scott, who helped prepare the warrant, confirmed that he and McLain "prepared a Search Warrant" and "did" obtain it before going into the car. *Id.* at 438:9–14. During the search, McLain found "two photographs" beneath the left-front driver's seat—both "taken at the Brick House Club"—which he placed into an evidence bag, which he in turn "[s]ealed" and marked the tape "RM, 8/20 of '99." *Id.* at 426:24–427:25. When asked at trial whether the photographs remained "in the same condition as they were on August 20th, 1999," McLain answered, "[y]es." *Id.* at 428:1–3. From the same car, Detective Scott recovered, among other things, an FP&L letter addressed to "Robert Kleckley," which he confirmed was "the address that [he] went to when Mr. Kleckley was arrested." *Id.* at 441:24–442:1; *see also id.* at 439.

Detective Jasinski later testified how, "as a result of getting [the] photographs" from the Oldsmobile, one of those photographs was placed "into a photo lineup," which was shown to Rodriguez at around 6:00 p.m. that day. *Id.* at 452:23–454:1. Rodriguez "positively identified"

Kleckley. *Id.* at 455. "Based upon . . . [his] identification[,]" officers went to arrest Kleckley about two hours later. *Id.* at 464:25–465:3.

**b. Analysis**

As we understand Ground Ten, Kleckley presses two subclaims. In Subclaim One, he says that his arrest was unconstitutional because police lacked probable cause and relied on photographs that (he thinks) were "tampered" with. Petition at 16. In Subclaim Two, Kleckley argues that his lawyer was constitutionally ineffective for not challenging those photographs and his arrest.[7] The Respondent says that the known facts established probable cause and that "[t]here is simply no evidence of tampering." Resp. at 52. We agree with the Respondent.

**1. Subclaim One: Trial Error**

As a preliminary matter, there's one threshold problem with Kleckley's freestanding trial-error claim. Where the State has provided "an opportunity for full and fair litigation of a Fourth Amendment claim," a state prisoner may not obtain federal habeas relief "on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 494 (1976). Kleckley had that opportunity. He was represented by a lawyer at trial, he could have moved to suppress the photographs, and he could have pressed the issue on direct appeal. Since the State gave him that opportunity, *Stone* forecloses Kleckley's freestanding Fourth Amendment claim here. *See Caver v. Alabama*, 577 F.2d 1188, 1192 (5th Cir. 1978) ("If a state provides the processes whereby a defendant can obtain full and fair litigation of a [F]ourth [A]mendment claim, [*Stone*] bars federal

[7] Although Ground Ten's heading includes "Ineffective Assistance Of Counsel," Kleckley principally argues that police lacked "probable cause to arrest" him because, among other things, the photographs they relied on were "tampered evidence." Petition at 16. In his Reply, though, Kleckley explicitly faults his lawyer for not "fil[ing] a motion to suppress the photographs and their fruits." Reply at 15. Mindful of Kleckley's *pro se* status, we'll construe Ground Ten as pressing *both* theories of trial error *and* ineffective assistance of counsel. *See Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998) (per curiam) ("*Pro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed." (citation omitted)).

habeas corpus consideration of that claim whether or not the defendant employs those processes.”).[8] Even so, and in the interest of fairness, we’ll still address Kleckley’s freestanding trial-error claim.

Kleckley’s trial-error theory has three moving parts: *first*, he says that there was a “lack of probable cause to arrest” him; *second*, he says that investigators should have done more—like examining “hair and blood samples”—before arresting him; and *third*, he alleges that the photographs were “tampered evidence” and that their “veracity” and “accuracy” weren’t established by the photographer. Petition at 16. All three claims fail.

**Probable Cause.** Probable cause turns on “the totality of the circumstances,” and it “requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.” *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (cleaned up). It isn’t “a high bar,” *ibid.*, and demands an inquiry into whether the facts known to the officer supplied a “fair probability” of criminal activity, *Illinois v. Gates*, 462 U.S. 213, 238 (1983). And the Eleventh Circuit, in turn, asks whether the officers’ “reasonably trustworthy information” would cause “a prudent person to believe that the suspect has committed or is committing an offense.” *Craig v. Singletary*, 127 F.3d 1030, 1042 (11th Cir. 1997) (en banc). Specifically, at the *arrest* stage, officers have long dealt in “probabilities”—the “factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.” *Brinegar v. United States*, 338 U.S. 160, 175 (1949). An arresting officer requires more than “mere suspicion,” but he needn’t take “every conceivable step . . . at whatever cost, to eliminate the possibility of convicting an innocent person” or “investigate independently every claim of innocence.” *Rankin v. Evans*, 133 F.3d 1425, 1435–36 (11th Cir. 1998) (cleaned up).

---

[8] Of course, *Stone* doesn’t bar Kleckley’s related ineffective-assistance-of-counsel claim, which we address later in this Section. *See Kimmelman v. Morrison*, 477 U.S. 365, 382–83 (1986) (holding that “*Stone*’s restriction on federal habeas review of Fourth Amendment claims” doesn’t extend to Sixth Amendment claims “founded primarily on incompetent representation”).

Here, the facts known to the officers before Kleckley's arrest supplied much more than "mere suspicion." *Rankin*, 133 F.3d at 1435. Officer Pacini heard "shots fired," saw two people point toward the green Oldsmobile after he asked, "who did the shooting," chased that car until it crashed, and watched a man with short dreads flee the vehicle. Trial Tr. at 398:19–22; *see also id.* at 401–08. The subsequent search of the Oldsmobile—conducted pursuant to a lawful warrant—produced photographs linked to Kleckley and an FP&L letter addressed to "Robert Kleckley" at the address the officers later used to find him. *Id.* at 426:9–427:25; *see also id.* at 441:22–442:1. Significantly, officers arrested Kleckley only *after* Rodriguez "positively identified" him from a photo lineup two hours before. *Id.* at 453:13–24; *see also id.* at 455–65. These facts, taken together, easily supplied a "fair probability" that Kleckley was the shooter. *Gates*, 462 U.S. at 238; *see, e.g.*, *Young v. Florida*, 2022 WL 2834668, at *7 (S.D. Fla. July 20, 2022) (Ruiz, J.) (rejecting a § 2254 petitioner's lack-of-probable-cause theory where multiple tips identified him and his codefendant as the perpetrators, and where the codefendant was positively identified as the shooter, reasoning that "[a]ll of this was sufficient to establish probable cause" because police had "sufficiently corroborate[d]" the tips).

But Kleckley's freestanding claim faces yet another hurdle. He insists that the officers' supposed lack of probable cause violated his "substantive and procedural due process rights," and he asks for "reversal for a new trial." Petition at 16. But courts have long recognized "that illegal arrest or detention does not void a subsequent conviction." *Gerstein v. Pugh*, 420 U.S. 103, 119 (1975). Indeed, "[a]n illegal arrest, without more, has never been viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction." *United States v. Crews*, 445 U.S. 463, 474 (1980). And Kleckley identifies no trial evidence that was obtained *because* of the arrest *and* which would disappear if the arrest were declared invalid.[9] After all, the two challenged photographs were recovered during the Oldsmobile

[9] The only trial evidence that followed the arrest—Kleckley's booking photograph and Cobb's later photo-lineup identification—wouldn't disappear if the arrest were invalid, since neither a defendant's face nor a witness's identification of it is suppressible as the fruit of an unlawful arrest. *See United States*

search *before* Kleckley's arrest, not after. So, even assuming there was a defect in the arrest, Kleckley hasn't explained how that defect requires a new trial. *See United States v. Cabezas-Montano*, 949 F.3d 567, 594 (11th Cir. 2020) (recognizing the well-settled principle that "a conviction will not be vacated on the ground that the defendant was detained pending trial without a determination of probable cause" (cleaned up)).

**Examinations.** Next, Kleckley briefly claims that detectives "never examined [the] relevant substance to confirm the perpetrator, such as hair and blood samples," Petition at 16, but he fares no better here. Probable cause requires a "sufficient probability, not certainty," *Craig*, 127 F.3d at 1042 (cleaned up), and officers aren't constitutionally required to pursue "every conceivable step" that might support innocence before making an arrest, *Rankin*, 133 F.3d at 1435–36 (cleaned up). Here, Rodriguez's positive identification, coupled with the chase, the fleeing suspect, and the Oldsmobile evidence gave officers far more than enough information to arrest Kleckley without first obtaining hair and blood samples. *Cf. id.* at 1436 (holding that, even though the arrestee was later "complete[ly] exonerat[ed] by the grand jury," "probable cause existed as a matter of law" to arrest him where medical evidence and other consistent statements reasonably indicated that he'd abused a child).

**Photographs.** Lastly, none of Kleckley's arguments about the photographs affect our conclusion. For starters, Kleckley says that the photographs' "veracity" wasn't "reviewed by the individual photographer," that the photographer should have appeared "at the scene of the collision or trial," and that the photographs' "accuracy" and "proximity of time" weren't proven. Petition at 16. But probable cause doesn't demand that evidence be "trial ready." An arrest may rely even on "hearsay evidence" because probable cause "cannot demand the same strictness of proof as the accused's guilt upon a trial[.]" *Draper v. United States*, 358 U.S. 307, 312 n.4 (1959) (cleaned up). And

---

*v. Crews*, 445 U.S. 463, 474 (1980) ("Respondent is not himself a suppressible 'fruit,' and the illegality of his detention cannot deprive the Government of the opportunity to prove his guilt through the introduction of evidence wholly untainted by the police misconduct.").

the photographs *here* weren't used in isolation. Detective Scott recovered an FP&L letter to "Robert Kleckley" from the same car, and Rodriguez then "positively identified" Kleckley before the arrest. Trial Tr. at 441:22–442:1; *see also id.* at 455. So, the photographer's absence didn't vitiate the "reasonably trustworthy information" the officers had acquired when they arrested Kleckley. *Craig*, 127 F.3d at 1042.

Kleckley also says that the photographs themselves constituted "tampered evidence" and that "cumulative evidence found in the vehicle" showed that he was "framed." Petition at 16. Kleckley doesn't tell us *who* supposedly altered or planted the photographs, *when* or *how* anyone did so, or which part of the photographs was altered. Habeas allegations must be "factual and specific," and "[c]onclusory allegations are simply not enough[.]" *Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) (citation omitted); *see also Borden v. Allen*, 646 F.3d 785, 810 (11th Cir. 2011) (explaining that the habeas rules require "fact pleading" rather than ordinary "notice pleading" (cleaned up)); *San Martin v. McNeil*, 633 F.3d 1257, 1271 (11th Cir. 2011) ("[A] petitioner is not entitled to an evidentiary hearing when his claims are merely conclusory allegations unsupported by specifics." (cleaned up)). In any event, *all* the trial evidence undermines his unsupported assertions. McLain identified *exactly* where he found "the two photos"—beneath the driver's seat—and said that he "[s]ealed" them, that he marked the evidence tape "RM, 8/20 of '99," and that they remained "in the same condition" throughout the trial. *Id.* at 426:23–427:25; *see also id.* at 428:1–3.

Kleckley tries (and fails) to concretize his tampering allegations in reply. He says that an "initial property report" listed only "cups and a water bottle," that a later report added the photographs, and that the vehicle warrant "was not signed until" seven days *after* the incident on "August 27, 1999"—an "impossible timeline" that, in Kleckley's view, "proves the evidence was planted." Reply at 15. For one thing, the supposed "August 27" date appears *nowhere* in the record. For another, Kleckley's chronology is entirely unsupported by the evidence. Two detectives—McLain and Scott—testified

that the warrant *preceded* the Oldsmobile search. *See* Trial Tr. at 426:9–17, 438:7–14. Technician Plunske said that she photographed the Oldsmobile at 3:30 p.m. on August 20, and she distinguished the *three* items that Detective McLain asked her to process for latent fingerprints—"[t]wo plastic drinking cups and one bottle of spring water"—from the "papers" and "photographs that were found inside the vehicle," which she also photographed. *Id.* at 345:20–346:23. Detective McLain then sealed the photographs "RM, 8/20 of '99," *id.* at 427:17–25, and Detective Jasinski used "the photograph which was found in the vehicle" in the lineup he showed Rodriguez at approximately 6:00 p.m. "on the 20th," *id.* at 453:13–24. That all leaves Kleckley's tampering theory unsupported by any record facts. For all these reasons, Kleckley's trial-error claim fails.

**2. Subclaim Two: Ineffective Assistance of Counsel**

In his Reply, Kleckley makes his ineffective-assistance theory explicit, saying that a "competent attorney" would have "filed a motion to suppress the photographs and their fruits" and that his lawyer's failure to do this was "constitutionally deficient performance." Reply at 15. This theory also fails, since Kleckley can't show deficient performance under *Strickland*.

When an ineffective-assistance-of-counsel claim rests on a lawyer's failure to litigate a Fourth Amendment issue, the petitioner must at least show "that his Fourth Amendment claim is meritorious." *Kimmelman*, 477 U.S. at 375. As we've explained, "[a] lawyer cannot be deficient for failing to raise a meritless claim." *Freeman*, 536 F.3d at 1233. In other words, if a lawyer believed that a search was lawful and that a suppression motion would be "futile," "an objectively reasonable lawyer could have chosen to file no motion to suppress." *Zakrzewski v. McDonough*, 455 F.3d 1254, 1260–61 (11th Cir. 2006).

Kleckley can't show deficient performance here. His suppression theory rests on the same premise we've already rejected, which is that police relied on "tampered evidence" to arrest him—a claim Kleckley never supports with specific facts.

In the interest of clarity, we'll briefly reiterate why this theory fails. Officers *first* obtained a warrant to search the car, then recovered the photographs under the driver's seat of the Oldsmobile, dated them "8/20 of '99," and kept them "in the same condition." Trial Tr. at 426–28. Two hours before Kleckley's arrest, Rodriguez "positively identified" Kleckley in a photo lineup. *Id.* at 453:13–24; *see also id.* at 455, 465. His lawyer therefore wasn't deficient for not filing a suppression motion that would have been unsupported by the evidence. And because Kleckley hasn't shown deficient performance, we needn't decide whether the lack of a motion to suppress prejudiced him. *See Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one.").

In the end, the arresting officers had more than a "fair probability" to believe that Kleckley was the shooter, *Gates*, 462 U.S. at 238, and his lawyer thus wasn't deficient for declining to press a futile suppression theory in state court. We therefore **DENY** Ground Ten.

## EVIDENTIARY HEARING

We won't hold an evidentiary hearing in this case. "[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). The trial and state-postconviction records resolve Kleckley's claims, and each of his expert-related claims rests on speculation about evidence he has never produced. In these circumstances, further factual development would be unnecessary.

## CERTIFICATE OF APPEALABILITY

A Certificate of Appealability ("COA") is appropriate only when the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Because we've resolved every remaining ground on the merits, a COA is warranted only if "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*,

529 U.S. 473, 484 (2000). Jurists of reason wouldn't debate our assessment of Kleckley's constitutional claims, so we'll **DENY** any request for a COA.

## CONCLUSION

After careful review, in short, we **ORDER AND ADJUDGE** as follows:

1. Robert Kleckley's Petition [ECF No. 1] is **DENIED**. Any requests for a COA and evidentiary hearing are **DENIED**.
2. All deadlines are **TERMINATED**, and any pending motions are **DENIED** as moot.
3. This case shall remain **CLOSED**.

**DONE AND ORDERED** in the Southern District of Florida on September 23, 2026.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc: Robert Kleckley, *pro se*
counsel of record